IN THE UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
Greenville Division

| | |
|---|---|
| CATHERINE EVANS, as Personal Representative of the Estate of Jarvis Johnmichael Evans,<br><br>      Plaintiff,<br><br>v.<br><br>LAURENS COUNTY SHERIFF'S OFFICE, DILLON MILLER, JARED ARMSTRONG, GERARD HILDEBRANDT, BRADY COX, CHRISTOPHER SORRELLS, AND DARRIN BOYD,<br><br>      Defendants. | **COMPLAINT**<br>**(Jury Trial Demanded)** |

NOW COMES Plaintiff Catherine Evans, as Personal Representative of the Estate of Jarvis Johnmichael Evans, by and through her undersigned attorneys, complaining of Defendants, respectfully submit the following:

**PARTIES, JURISDICTION AND VENUE**

1. Plaintiff, Catherine Evans (hereinafter "Rev. Evans"), at all times herein, is *sui juris*, the natural mother and duly appointed Personal representative of the Estate of Jarvis Johnmichael Evans (hereinafter "Decedent") by Order of the Laurens County Probate Court. At all times herein, she is a citizen of Laurens County, State of South Carolina.

2. Defendant Laurens County Sheriff's Office (hereinafter, "LCSO") is a political subdivision organized and existing pursuant to the laws of the State of South Carolina. Defendant LCSO is responsible for the acts, errors and omissions of its agents / employees. In his capacity as elected Sheriff of Laurens County, Sheriff Don Reynolds is the custodian of the R. Eugene

Johnson Detention Center (hereinafter "JDC") and is charged with the safekeeping of any person delivered or committed to the JDC pursuant to state law. He is the primary and final policymaker and responsible for the policies, practices, supervision, implementation, and conduct of all LCSO personnel, including LCSO deputies and LCSO detention deputies working in the JDC (hereinafter "JDC Deputies").

3. Upon information and belief, Defendant Dillon Miller was at all times relevant, a citizen and resident of the State of South Carolina who was acting under color of law and within the course and scope of his employment and agency as a JDC Deputy. He is being sued in his individual capacity for compensatory and punitive damages under federal law.

4. Upon information and belief, Defendant Jared Armstrong was at all times relevant, a citizen and resident of the State of South Carolina who was acting under color of law and within the course and scope of his employment and agency as a JDC Deputy. He is being sued in his individual capacity for compensatory and punitive damages under federal law.

5. Upon information and belief, Defendant Gerard Hildebrandt was at all times relevant, a citizen and resident of the State of South Carolina who was acting under color of law and within the course and scope of his employment and agency as a LCSO Deputy. He is being sued in his individual capacity for compensatory and punitive damages under federal law.

6. Upon information and belief, Defendant Brady Cox was at all times relevant, a citizen and resident of the State of South Carolina who was acting under color of law and within the course and scope of his employment and agency as a JDC Deputy. He is being sued in his individual capacity for compensatory and punitive damages under federal law.

7. Upon information and belief, Defendant Christopher Sorrells was at all times relevant, a citizen and resident of the State of South Carolina who was acting under color of law and within the

course and scope of his employment and agency as a JDC Deputy. He is being sued in his individual capacity for compensatory and punitive damages under federal law.

8. Upon information and belief, Defendant Darrin Boyd was at all times relevant, a citizen and resident of the State of South Carolina who was acting under color of law and within the course and scope of his employment and agency as a LCSO Deputy. He is being sued in his individual capacity for compensatory and punitive damages under federal law.

9. This court has personal jurisdiction over the parties named above, subject matter jurisdiction over the causes of action set forth below, and venue is proper in that a substantial part of the acts and omissions alleged herein occurred in Laurens County, South Carolina.

10. Plaintiff brings these claims of civil rights violations against Defendants, including but not limited to the right to be free from excessive force, and as a pretrial detainee, rights to receive adequate medical care and freedom from deliberate indifference to his serious medical needs pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988.

## FACTUAL BACKGROUND

11. Decedent, a forty-year-old black male with a life-long history of mental illness, was a resident of Laurens County at the time of the facts giving rise to this action.

12. Each of the Defendants had actual and constructive knowledge of Decedent's mental illness and LCSO Deputies routinely responded to his residence to assist in the transport of Decedent to a facility where he could receive psychiatric evaluations.

13. In December of 2018, LCSO responded to a call from Decedent wherein he was attempting to overdose on Prozac. At the direction of LCSO, Decedent was transported to Laurens County Hospital and involuntary commitment proceedings were initiated in the Laurens County Probate Court.

14. Upon being evaluated by two designated medical examiners appointed by the Laurens County Probate Court, Decedent was found to be suffering the effects of a "severe mental illness, to include paranoia, adjustment disorder, and auditory hallucinations."

15. As a result, Decedent was involuntarily committed and transported by Defendant LCSO to the Medical University of South Carolina's Institute of Psychiatry (hereinafter "MUSC IOP"), where he remained for approximately fifteen (15) days.

16. Similarly, in January of 2021, Defendant LCSO responded to Decedent's home after Decedent called 911 to report that people were trying to poison him. Upon LCSO's arrival, Decedent was yelling and evading contact with LCSO deputies. Once LCSO successfully detained Decedent, he was transported to Spartanburg Medical Center for psychiatric evaluation.

17. In the instant action, on the evening of July 29, 2021, Decedent once again called 911 to report that he was "afraid for his life because there were people with guns in the house." On the 911 call, Decedent's mother, Rev. Evans, spoke to the operator and informed them that her son was mentally ill and high on drugs.

18. LCSO Deputy Andrew Athens arrived on scene and found Decedent to be "sweating perfusely (sic), acting irate, and was edgy with his movements."

19. The Decedent informed Deputy Athens that "my mom got a hit out on me" and began running around the yard while on the phone with 911 operator, who described the Decedent as "flippin' out."

20. Rev. Evans informed Deputy Athens that Decedent suffered from mental illness his entire life and had recently been hospitalized at MUSC IOP and Spartanburg Medical Center.

21. Rev. Evans informed Deputy Athens that Decedent left the house earlier that evening to go to the gas station, and that she believed Decedent had "taken some drugs laced with something."

22. Rev. Evans further requested that Decedent be taken to the hospital, just as LCSO had done each of the last two times they responded to Decedent's home.

23. Deputy Athens secured the Decedent in handcuffs and placed him in the back of his vehicle.

24. Prior to leaving, Deputy Athens assured Rev. Evans that he was taking Decedent to the hospital.

25. Deputy Athens informed his supervisor, Defendant Boyd, that he was transporting the Decedent to the hospital to be evaluated due to his history of being admitted at MUSC IOP, his mental health issues, and his suspected drug use.

26. Upon information and belief, Defendant Boyd objected and instructed Deputy Athens to return to the home of the Decedent and await his arrival.

27. Upon arriving at the home, Defendant Boyd instructed Deputy Athens to turn off his body-worn camera and Defendant Boyd purposely failed to activate his own.

28. The outcome of that purposely unrecorded conversation between Deputy Athens and Defendant Boyd was that the Decedent would not be taken to the hospital, as required by LCSO Policies and Procedures, and instead would be charged with misdemeanor breach of peace and misdemeanor resisting arrest and taken directly to the JDC where JDC Deputies would be responsible for the care, custody and control of Decedent.

29. At the time LCSO took custody of Decedent, he was suffering the effects of a severe mental illness and acute drug ingestion.

30. Despite the obvious need for medical attention, Deputy Athens and all named Defendants purposely refused to comply with South Carolina state law and LCSO policies, both of which required Decedent to be cleared medically before being confined at the JDC.

31. Instead of taking Decedent to the hospital, JDC detention deputies were informed by dispatch that Deputy Athens was in route with "a combative."

32. Upon arrival at the JDC, Decedent, while still handcuffed, got out of Deputy Athens's patrol car without incident.

33. While being forcefully escorted from the patrol car by Defendant Boyd and Defendant Hildebrandt, Decedent attempted to hit his forehead on a JDC glass window.

34. Defendant Hildebrandt, with both hands, proceeded to grab, lift, and carry the Decedent by his neck into the JDC booking area, in direct violation of LCSO policies prohibiting all forms of chokeholds.

35. Upon information and belief, the LCSO contracted with Southern Health Partners, Inc. (hereinafter, "Southern Health") to provide medical care to all JDC inmates.

36. Upon information and belief, a Southern Health employee is required to be present at the JDC from 7:00am – 11:00pm and be on-call thereafter, so to provide JDC inmates and JDC deputies immediate access to medical care, support, and clearance 24 hours a day.

37. Upon information and belief, Decedent arrived at the JDC at 10:56pm, however, the Southern Health employee assigned to the JDC (hereinafter, "Nurse Brenda") left early at 10:42pm.

38. Despite the obvious need for medical attention, multiple JDC deputies and all named Defendants purposely failed to have the Decedent cleared medically before being booked into the JDC as required by state law and LCSO polices.

39. Once in the booking area, Defendant Hildebrandt continued to squeeze Decedent's neck and smash his face into a glass window, as LCSO deputies and JDC deputies stood by, watched, and failed to intervene.

40. Following this use of force, and in direct violation of LCSO policies and Decedent's constitutional rights, JDC deputies and all named Defendants failed to contact and request appropriate medical intervention from Southern Health.

41. While being held against the window, Decedent complained of being unable to breathe and began screaming to his mother for help while JDC deputies placed leg restraints on Decedent.

42. Following this additional use of force, and in direct violation of LCSO policies and Decedent's constitutional rights, multiple deputies and all named Defendants failed to contact and request appropriate medical intervention from Southern Health.

43. After several unsuccessful attempts to remove and replace Deputy Athens's handcuffs, JDC deputies became frustrated with their inability to do so.

44. Despite Defendant Armstrong's demand to "just tase this mother fucker…please just tase this mother fucker," LCSO deputies and JDC deputies violently forced Decedent into the prone position on the ground and used their knees to apply pressure to his head, neck and back until LCSO deputies and JDC deputies were finally able to successfully perform the routine task of switching out Deputy Athens's handcuffs for JDC handcuffs.

45. Following this additional use of force, and in direct violation of LCSO policies and Decedent's constitutional rights, multiple deputies and all named Defendants failed to contact and request appropriate medical intervention from Southern Health.

46. As a form of punishment, JDC deputies placed a spit mask over Decedent's head despite Decedent never spitting or attempting to spit on any deputies.

47. Following this additional use of force, and in direct violation of LCSO policies and Decedent's constitutional rights, multiple deputies and all named Defendants failed to contact and request appropriate medical intervention from Southern Health.

48. After restraining Decedent's arms behind his back by handcuffs, applying leg restraints and a spit mask, multiple deputies and all named Defendants lifted Decedent off the ground and into an emergency restraint chair ("ERC") to punish the Decedent.

49. Following this additional use of force, and in direct violation of LCSO policies and Decedent's constitutional rights, multiple deputies and all named Defendants failed to contact and request appropriate medical intervention from Southern Health.

50. While being forcefully strapped into the ERC, the Decedent asks, "why are y'all doing this to me", to which Defendant Armstrong responded, "well, maybe we wouldn't have to if you didn't come in here acting like a complete fucking retard…you dumb piece of shit."

51. Defendant Armstrong, who had not received any ERC training, tried to secure the chest straps and lap band of the ERC on the Decedent, while other deputies and all named Defendants strapped Decedent's arms and legs to the ERC.

52. Within a minute of forcefully placing Decedent into the ERC, JDC deputies had successfully secured the strap on both of Decedent's arms, his right leg, his lap, and his chest.

53. As a result of not being trained, or in the alternative, not receiving proper training, JDC deputies and all named Defendants had difficulty in securing Decedent's left leg into the ERC.

54. As an improper means of pain compliance, JDC deputies and all named Defendants forcefully pulled the ERC chest straps as tight as possible on Decedent while JDC deputies and all named Defendants continued their attempt to secure Decedent's left leg into the ERC.

55. Simultaneously, as an additional improper means of pain compliance, Defendant Armstrong kept "pulling and pulling the lap belt as tight as he possibly could" on Decedent while JDC deputies and all named Defendants continued their attempt to secure Decedent's left leg into the ERC.

56. Defendant Armstrong lifted his fist at Decedent and said, "If you move, I will fucking deck you."

57. Defendant Miller handed his LCSO issued TASER weapon to Defendant Armstrong, who pressed it against Decedent's leg in drive-stun mode and yelled, "If you move your leg, I will tase you. Don't you fucking move, or I will fucking tase you…you piece of shit," as JDC deputies and all other named Defendants stood by, watched, and failed to intervene.

58. Deputy Armstrong then handed the TASER back to Defendant Miller, who continued to press it against Decedent's right leg in drive-stun mode, as JDC deputies and all other named Defendants stood by, watched, and failed to intervene.

59. With the TASER still pressed against Decedent's right leg, JDC deputies and all named Defendants were able to restrain the Decedent's left leg.

60. Despite being fully restrained in the ERC chair, Decedent attempted to move his upper legs from side to side, which frustrated JDC deputies and named Defendants.

61. In response, Defendant Miller punished the Decedent by using the TASER to drive-stun the right leg of Decedent, causing immediate pain and discomfort, as JDC deputies and all other named Defendants stood by, watched, and failed to intervene.

62. Following these additional uses of force, and in direct violation of LCSO policies and Decedent's constitutional rights, multiple deputies and all named Defendants failed to contact and request appropriate medical intervention from Southern Health.

63. Seconds later, and despite being fully restrained, Defendant Miller punished the Decedent by using the TASER to drive-stun the right leg of Decedent a second time, causing immediate pain and discomfort, as multiple deputies and all named Defendants stood by, watched, and failed to intervene.

64. Following this additional use of force, and in direct violation of LCSO policies and Decedent's constitutional rights, multiple deputies and all named Defendants failed to contact and request appropriate medical intervention from Southern Health.

65. Seconds later, and despite being fully restrained, Defendant Miller punished the Decedent by using the TASER to drive-stun the right leg of Decedent for the third time in less than 20 seconds, causing immediate pain and discomfort, as multiple deputies and all named Defendants stood by, watched, and failed to intervene.

66. Following this additional use of force, and in direct violation of LCSO policies and Decedent's constitutional rights, multiple deputies and all named Defendants failed to contact and request appropriate medical intervention from Southern Health.

67. The Decedent was wheeled into Holding Cell 2 so he could be "monitored" via video while fully restrained in the ERC with a spit mask over his face and suffering the effects of three TASER cycles.

68. After placement and movement of an inmate in an ERC, LCSO policies require JDC deputies to immediately notify and consult with Southern Health, so that medical staff can make a documented medical assessment of the inmate.

69. In direct violation of LCSO policies and Decedent's constitutional rights, but in concert with the unofficial JDC policy of rarely, if ever, using the on-call number, JDC deputies and all named Defendants failed to contact and request appropriate medical intervention from Southern Health.

70. Upon locking Decedent in the cell, Decedent "continued to yell and thrash around to the point he moved the restraint chair around the toilet and toward the wall. He was sweating profusely, his veins could be seen in his arms, and he was making statements that did not make sense."

71. In direct violation of LCSO policies and Decedent's constitutional rights, but in concert with the unofficial JDC policy of rarely, if ever, using the on-call number, JDC deputies and all named Defendants failed to contact and request appropriate medical intervention from Southern Health.

72. LCSO policies require JDC deputies to visually observe inmates restrained in the ERC every fifteen (15) minutes, at a minimum.

73. When the Decedent was first placed in the holding cell at approximately 11:30pm, JDC deputies noted his condition as "yelling, thrashing."

74. Despite the maximum fifteen (15) minutes mandated by JDC policies, Decedent was visually observed twenty (20) minutes after being placed in the holding cell, and once again noted his condition as "yelling, thrashing."

75. Despite the maximum fifteen (15) minutes mandated by JDC policies, an additional twenty-five (25) minutes elapsed before the next visual observation of Decedent performed by JDC deputies, which once again noted his condition as "yelling, thrashing."

76. Despite the maximum fifteen (15) minutes mandated by JDC policies, an additional twenty-five (25) minutes elapsed before the next observation of Decedent was performed by JDC deputies, which curiously, noted his condition as "*alive*, yelling."

77. An indeterminate amount of time later, while a JDC deputy happened to walk by the holding cell, he noticed Decedent was "unresponsive with his head laid back in the restraint chair."

78. For the first time since the Decedent arrived at the JDC, JDC deputies finally contacted medical staff and requested medical intervention.

79. Laurens County Emergency Medical Services ("EMS") responded to the JDC and transported Decedent to the hospital. He was pronounced dead at 2:59am on July 30, 2021.

80. Just prior to 8:00am on July 30, 2021, and less than ten (10) hours after Deputy Athens informed Rev. Evans that he was taking the decedent from her home to the hospital, Rev. Evans was informed that her son had died at the JDC while under the custody, care and control of Defendant LCSO.

81. An autopsy was requested by the Laurens County Coroner and performed that same morning.

82. The report listed "Accident" as Decedent's manner of death.

**FOR A FIRST CAUSE OF ACTION**
**(42 U.S.C. § 1983 – Violation of Decedent's Fourteenth Amendment Right to be Free from Excessive Force as to Miller and Hildebrandt)**

83. Plaintiff incorporates by reference all previous allegations of fact and law as if repeated herein.

84. At all times relevant hereto, Defendants Miller and Hildebrandt were deputies with LCSO and acted under the color of state law.

85. At all times relevant hereto, Decedent was not combative; Decedent did not present a threat of bodily harm to Miller and/or Hildebrandt; Decedent was not violent; and Decedent did not exhibit any uncontrollable behavior.

86. Defendant Hildebrandt lifted Decedent by his neck, lifting him off the ground, and continuing to squeeze his neck once inside the booking area and surrounded by a number of JDC deputies.

87. Defendant Miller used a TASER three times on the Decedent while Decedent was restrained in the ERC with a spit mask over his face.

88. The acts and omissions of Defendants Miller and Hildebrandt, including, but not limited to, choking the Decedent and taser deployments to the body of Decedent, for which no adequate medical assessment was performed, participating in the foregoing acts and omissions, ordering, authorizing, directing, supervising, approving and/or ratifying the foregoing acts and omissions, and acquiescing, and/or failing to prevent the foregoing acts and omissions,

constitute conduct under the color of state law which deprived Decedent of his clearly established and known rights, privileges, and immunities secured by the Constitution, laws of the United States, and laws of the State of South Carolina.

89. As a direct and proximate result of the foregoing conduct, the Defendant Miller and Defendant Hildebrandt deprived Decedent of his clearly established and known rights under the Fourteenth Amendment of the United States Constitution. More specifically, these Defendants deprived Decedent of his right to be free from the use of excessive, outrageous, and unreasonable force.

90. As a direct and proximate result of Defendant Miller and Defendant Hildebrant's violations of Decedent's Constitutional rights, Decedent was forced to endure and suffered extreme physical, mental, and emotional pain and suffering.

## FOR A SECOND CAUSE OF ACTION
### (42 U.S.C. § 1983 – Bystander Liability as to Sorells, Armstrong, and Boyd)

91. Plaintiff incorporates by reference all previous allegations of fact and law as if repeated herein.

92. Defendants Sorrells, Armstrong, and Boyd were present at the time of each use of force, and more specifically, at the time of each excessive use of force, being Defendant Hildebrandt's choking of Decedent and Defendant Miller's use of the TASER on Decedent.

93. At no time during Defendant Hildebrandt's choking of Decedent did Defendants Sorells, Armstrong, or Boyd attempt to intervene or otherwise stop Defendant Hildebrandt from choking the Decedent.

94. At no time during each of the three uses of the Taser by Defendant Miller on the restrained Decedent did Defendants Sorells, Armstrong, or Boyd attempt to intervene or otherwise stop Defendant Miller from using the Taser on the restrained Decedent.

95. As a direct and proximate result of the foregoing conduct, Defendants Sorrells, Armstrong and Boyd deprived Decedent of his clearly established and known rights under the Fourteenth Amendment of the United States Constitution. More specifically, these Defendants deprived Decedent of his right to be free from the use of excessive, outrageous, and unreasonable force.

96. As a direct and proximate result of Defendants Sorrells, Armstrong, and Boyd's violations of Decedent's Constitutional rights, Decedent was forced to endure and suffered extreme physical, mental, and emotional pain and suffering.

### FOR A THIRD CAUSE OF ACTION
### (42 U.S.C. § 1983 – Deliberate Indifference to Medical Needs as to All Defendants)

97. Plaintiff incorporates by reference all previous allegations of fact and law as if repeated herein.

98. Upon LCSO's initial contact with Decedent, LCSO learned of Decedent's mental health condition and possible drug use, along with LCSO's history of contact with Decedent.

99. Upon arrival at JDC, all Defendants named herein failed to ensure Decedent received any medical care at all, and more specifically, medical care related to the uses of force he endured.

100. All Defendants failed to contact Southern Health or any other medical provider, as required by state law and their policies and procedures, resulting in a violation Decedent's constitutional right to medical care and constituting a deliberate indifference to Decedent's medical needs.

101. As a direct and proximate result of all Defendant's violation of Decedent's Constitutional rights, Decedent suffered physical, mental, and emotional pain and suffering.

### FOR A FOURTH CAUSE OF ACTION
### (42 U.S.C. § 1983 – Supervisory Liability as to Defendant Sorrells)

102. Plaintiff incorporates by reference all previous allegations of fact and law as if repeated herein.

103. Defendant Sorrells was one of the shift supervisors the night of July 29, 2021.

104. Defendant Sorrells participated in placing Decedent in the ERC, strapping Decedent in the ERC, and moving the ERC into a cell.

105. Defendant Sorrells knew, and gave tacit authorization of, the use of the Taser by Defendant Miller on Decedent's restrained body.

106. Defendant Sorrells knew of the risks of using a Taser on a restrained person.

107. As a direct and proximate result of Defendant Sorrells's authorization of the use of the Taser by Defendant Miler, Decedent was forced to endure and suffered extreme physical, mental, and emotional pain and suffering.

## FOR A FIFTH CAUSE OF ACTION
### (42 U.S.C. § 1983 – *Monell* Claim)

108. Plaintiff incorporates by reference all previous allegations of fact and law as if repeated herein.

109. LCSO, by and through its policymaker Sheriff Reynolds, is an actor for purposes of 41 U.S.C. § 1983 liability.

110. LCSO, by and through its policymaker Sheriff Reynolds, has a policy, custom, or culture of failing to notify, call, or request medical care for its inmates if there are not medical personnel on-site at JDC.

111. LCSO's policy, custom, or culture of failing to notify, call, or request medical care for its inmates if there are not medical personnel on-site at JDC creates an obvious risk of violation of inmates', and more specifically Plaintiff's, clearly established right to adequate medical care while housed at JDC.

112. Through the policy, custom, or culture of failing to notify, call, or request medical care for its inmates if there are not medical personnel on-site at JDC, LCSO, by and through its policymaker Sheriff Reynolds, had actual and constructive knowledge that persons in the

custody of LCSO at JDC had and were experiencing numerous, recurrent violations of their constitutional right to adequate medical care.

113. The policy, custom, or culture by LCSO, by and through its policymaker Sheriff Reynolds, implicitly ratified the dangerous act of failing to request medical care for inmates, and created a culture whereby deputies knew that there was no supervision, monitoring, and/or accountability for their dangerous custom of failing to request medical care.

114. At all times relevant to this Complaint, LCSO, by and through its policymaker Sheriff Reynolds, acted with recklessness and deliberate indifference to the need for medical care by Decedent and fellow inmates, constituting a conscious disregard to the clearly established rights of Decedent.

115. The implicit ratifying and failure by Defendant LCSO to take any actions to monitor, supervise, stop, correct, or ameliorate these known and ongoing violations of the inmates clearly established right to receive adequate medical care was the proximate cause of the injuries sustained by Decedent resulting in his death.

116. LCSO, by and through its policymaker Sheriff Reynolds, knowingly disregards the risks and consequences of executing the aforementioned policy, custom, or culture, in violation of Plaintiff's constitutional right to adequate medical care.

117. The policy, custom, or culture of LCSO of failing to notify, call, or request medical care for its inmates if there are no medical personnel physically on-site at JDC caused the injuries and death of Jarvis Evans while in the care and custody of LCSO at JDC.

**FOR A SIXTH CAUSE OF ACTION**
**(42 U.S.C. § 1988 – Attorney's Fees)**

118. Plaintiff incorporates by reference all previous allegations of fact and law as if repeated herein.

119. Plaintiff is entitled to reasonable costs and attorney fees pursuant to 42 U.S.C. § 1988 and applicable statutes and laws.

WHEREFORE, Plaintiff prays for judgment against each Defendant, and for:

a. A trial by jury;

b. That judgment be rendered against Defendants for all damages recoverable in an amount to be determined by a jury;

c. For an award of attorney's fees pursuant to 42 U.S.C. § 1988; and

d. For all such other relief which the Court deems appropriate.

Respectfully submitted,

THE PEPER LAW FIRM, PA

s/ *Mark A. Peper*
Mark A. Peper, Esq. (Fed. Bar #12134)
Brenna D. Wiles, Esq. (Fed. Bar #13073)
548 Savannah Highway
Charleston, SC 29407
O: (843) 225-2520
F: (843) 225-2554
mark@peperlawfirm.com
brenna@peperlawfirm.com

HENDERSON LAW GROUP
Rosalyn Henderson-Myers, Esq.
P.O. Box 3341
Spartanburg, SC 29304
O: (864) 345-2221
rhmyers@hendersonlawgroupsc.com

*COUNSEL FOR PLAINTIFF*